# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL WILLIAMS, <br> BRIAN THOMAS, <br> SEDRICK PHILLIPS, <br> MIKAL DAVIS, et al. <br><br>     Plaintiffs, <br><br>         v. <br><br> SALVADOR GODINEZ, et al. <br><br>     Defendants. | Case No. 12 cv 808 <br><br> MAGISTRATE WILLIAMS |

## PLAINTIFFS' PETITION FOR ATTORNEYS' FEES AND COSTS

NOW COMES the Plaintiffs, by and through their attorneys, ED FOX & ASSOCIATES, LTD., and in support of their Petition for Attorneys' Fees and Costs state as follows:

### I. INTRODUCTION

Litigation in this case commenced on May 25, 2012, nearly 5 years ago. During that time, the Defendants vigorously litigated this case, not making any offers to settle until September of last year at which time settlement negotiations got underway and finally resulted in a settlement. This case was difficult, not only because conditions of confinement cases are generally difficult, but also because obtaining information in a class case is difficult as members of the class are widely spread across the state and obtaining information from them via telephone or in person, both of which was done in this case, is time consuming and also difficult.

To attempt to build a body of evidence showing that there were unconstitutional conditions of confinement that permeated Dixon Springs that were common to the Plaintiffs in

the class, counsel made numerous telephone calls, and many trips throughout the state talking to various former Dixon Springs inmates. Various witnesses who would be valuable to the case were decided upon, they were prepared for depositions (of which there were 9), and their depositions were taken. These persons' depositions were then sent to them, subsequent discussions were had and they were continuously monitored to ensure that they would be able to appear for trial, which for most of them was located hours from their residence. This all became necessary as trial was mere weeks away at the time settlement was reached.

The witnesses' testimony along with that of the 4 Plaintiffs was the key to the case as their testimony was remarkably consistent on the key issues, as documented in the Plaintiffs' trial brief. Likewise, maintaining contact with the named Plaintiffs and ensuring that they were prepared and able to make it to the trial in Southern Illinois was also done through frequent telephone calls and meetings.

As set forth below this case ultimately settled. As part of the settlement it was agreed that Plaintiffs would file a fee petition and would be limited to $117,000 regardless of the time spent on the case.

## II. BACKGROUND

As noted, this motion comes here pursuant to a settlement. In the settlement agreement, the parties agreed that the Plaintiffs would submit an attorneys' fee petition and that Plaintiffs' counsel would need to justify their fees in the petition. Under the agreement, the amount of fees and expenses awarded cannot exceed $117,000.00. This amount was arrived at based upon negotiations. Prior to settlement Plaintiffs' settlement demand letter to Defendants included attorneys' fees of roughly $155,400, plus approximately $7,000 in costs.[1] The case settled at a

---

[1] The letter was sent on August 23, 2016. Since that time, many additional hours were spent on the case and Plaintiffs' request based upon hours spent on the case would roughly double what is being sought here.

compromise rate to accomplish the settlement. As a result, Plaintiffs' counsel agreed to limit their request for fees to $117,000.00.

Further, in connection with the settlement itself, Plaintiffs' original demand for each of the four Plaintiffs was $6,500.00; this was raised to $13,500 in the more recent settlement letter, in large part due to the additional work and development of the case. Each of the Plaintiffs ultimately received $6,000 each. In the context of class action conditions of confinement cases, this sum is at the higher end of the range typically agreed upon.

### III. STATMENT OF FACTS

On May 25, 2012, four Plaintiffs filed their complaint against various officials who were charged with running, working at, and/or supervising employees at the Dixon Springs Boot Camp. Plaintiffs alleged a conditions of confinement claim, primarily focusing on the issues of cold, bad food, and bathroom conditions under section 1983. Plaintiffs also made class wide allegations claiming that the conditions applied to all inmates incarcerated at Dixon Springs in that all inmates were subjected to the allegedly unconstitutional conditions of confinement.

Among other things the Plaintiffs alleged that Plaintiffs were forced to eat spoiled meat and dairy products and that there were bugs in Plaintiffs' food. They also alleged that the heat was almost never on in the dorms and that class members were not given coats, hats, or gloves despite very cold temperatures, and that they were forced to sleep at night in underwear and with just one thin blanket which was inadequate. In connection with bathroom conditions, Plaintiffs alleged that were are an unreasonably low number of toilets for the number of inmates and that each inmate was allotted a maximum of two minutes or less to use the toilet.

The Court granted Plaintiffs' motion for class certification on March 31, 2014.

In the 6 months leading to trial, the Defendants conducted extensive discovery, propounding interrogatories on Plaintiffs' damages and doing depositions of 9 class witnesses who were all former inmates at Dixon Springs. Extension preparation was done in connection with the depositions. At the depositions, Plaintiffs developed evidence through testimony and expanded on the allegations contained in the complaint. In connection with issues of the cold, the witnesses and plaintiffs have uniformly testified that the dorms were so cold that the guards would only be stationed in there when accompanied by a space heater and heavy coats, while the inmates were in their underwear and t-shirts. The witnesses and Plaintiffs commonly indicated that one could see his breath when inside a dorm. For bedding, the inmates were allowed one thin well-used blanket and could not request more than that. The Plaintiffs and witnesses were expected to testify that the blankets had holes in them and were often ripped. The problems with the cold and inadequate bedding became exacerbated because the roof in the dorms leaked water.

Cold weather also impacted inmates outside. Exercise usually had to be outside, particularly because the gym was used as a dorm. The inmates exercised in the rain, cold, snow and slush. They were inadequately dressed for that. In this regard, some inmates, *at most,* were outside with thin sweat suits, and because inmates were ordered outside for exercise with little notice, they often did not have the time to retrieve even their sweat suits because if they were late to make it outside (which often happened because of the procedures) they were severely punished. As a result, inmates were often outside in the cold exercising for lengthy periods of time with just t-shirts. Many of them testified that they never had gloves on despite the fact that they were ordered to be prone on the ground in the rain/cold/snow doing such things as pushups, among other exercises, in which they had to lay on the ground. The shoes that the inmates wore

were old, many had holes in them, did not fit right, and would leak cold water or snow into the shoes. As a consequence, many of the inmates developed foot problems while at Dixon.

Regarding the food issues the Plaintiffs and their witnesses all gave consistent valuable testimony. All of the inmates and the Plaintiffs would testify to food that was spoiled, expired by date, and/or was bug infested. Some of the Plaintiffs and witnesses were in a particularly good position to be aware of the food issues because they worked in the kitchen. It was more common than not for the milk that was being used to have an expired date on it. The food would sometimes be over-seasoned to attempt to hide the rancid smell of it. The bread often was moldy. The crackers were usually bug invested. The inmates were commonly told to just pick the bugs out of the food.

Inmates had to eat all the food that was on their tray –whether it was spoiled, moldy, rancid or seasoned such that it was too hot to eat. Inmates would sometimes try and hide moldy or spoiled food to avoid eating it. When caught doing this they would be punished abusively.

Similarly, the testimony and evidence that was developed regarding bathroom issues was also invaluable. The bathroom procedures were inhumane. There were an inadequate number of bathroom stalls and urinals. Compounding this problem, frequently, one or more of the bathroom stalls and/or urinals were not working. This is amply documented in the work order notes. Probably because of the need to have a large number of inmates needing to use a small number of toilets (in addition to simply being malicious), inmates would be allowed very limited time on the toilet. There are varying accounts of this and it would depend on which guard was in charge at the time, but uniformly, the time permitted on the toilet has been reported to be anywhere from 10 seconds to two minutes. If an inmate was not finished he or she was required to get up anyway and this would frequently result in feces falling to the floor, on to the base of

5

the toilet or other places it should not be in. Cleanup of this would not be permitted until sometime after the entire group was done using the bathroom. As a result, bathroom use was often a dirty, unhealthy, and just gross endeavor.

The parties tried to settle this case over a lengthy period of time. The Defendants did not make any offer over a lengthy period of time. The parties began to discuss the possibility of settlement in or around December, 2014. This initial discussion went on until the end of June, 2015, but no offer was made. During this time, the Defendants were given leave to do damages discovery. In October, 2015, Plaintiffs were given leave to supplement their Rule 26(a) disclosures with additional witnesses. This was done and Defendants were then given leave to take depositions of the additional persons that were named as witnesses. The depositions of these witnesses were completed during the first half of 2016. Beginning around June, 2016, the parties began trial preparations. Both parties did briefing on motions *in limine* and oppositions, as well as the pretrial order and trial briefs. In August, the Defendants suggested that settlement negotiations might be for a settlement conference. The parties were ordered to do written settlement demands and to appear at court on September 2, 2016 for a settlement conference. This was continued but it began to appear that settlement might occur. After additional negotiation the case finally settled and this was reported to the court on September 22, 2016.

### IV. ARGUMENT

**A. As The Prevailing Party In a Class Action Case, Plaintiff's Counsel Are Presumptively Entitled To Their Reasonable Attorneys' Fees Using the Lodestar Method**

**1. It is Appropriate to Use a Lodestar to Determine Fees**

Settlement agreements in class action cases which incorporate attorneys' fees provisions provide the Court with the discretion to award fees as appropriate and consistent with the

agreement. *Florin v. Nationsbank of Georgia, N.A.,* 34 F.3d 560, 563–64 (7th Cir. 1994). Further, in civil rights cases, the Court has the discretion to use the lodestar approach to determine attorneys' fees. *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.,* 743 F.3d 243, 244–48 (7th Cir. 2014). In a case such as the instant case, in which the settlement payout is made on a "claims made" basis[2] to those in the class, and the attorneys' fees are acknowledged and are separate, with a negotiated ceiling on them, it is appropriate to award fees to the "prevailing party" on a lodestar basis. This is in large part because the fees come from the Defendant and not a common fund. *Sutton v. Bernard*, 504 F.3d 688, 692–93 (7th Cir. 2007). It is settled law that the Court has the discretion to use the lodestar method to award fees in this case. *E.g., Americana Art China Co. v. Foxfire Printing & Packaging, Inc., Supra*, at 247.

**2.     Plaintiff Was Unquestionably A Prevailing Party**

Under applicable law, a plaintiff may be considered a prevailing party "…if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Sottoriva v. Claps*, 617 F.3d 971, 975 (7th Cir. 2010). When a party prevails at trial in a civil rights case, the prevailing attorneys are entitled to recover their reasonable attorneys' fees for the services they provided. *County of Riverside v. Rivera*, 477 U.S. 561, 578 (1986) (fee awards are designed "to encourage the bringing of meritorious claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel").

Plaintiffs received a reasonable settlement of $6,000.00 each. In the context of a class case, in counsel's experience, this is a very reasonable and substantial sum at the higher end of the typical range. The class members are to receive $150.00 each and again, in the context of

---

[2] In a "claims made" settlement type, the potential settlement total amount is never known until the deadline for making claims expires. The potential depends upon the number of members in the class. In this case, there were estimated to be about 450 members in the class.

7

class wide inmate settlements, this amount is well within the range of such settlements. When this is coupled with the agreement that Plaintiffs' counsel receive up to $117,000 in fees and costs, there is no question that Plaintiff is the "prevailing party" within the meaning of 42 U.S.C. §1988(b). The Plaintiffs essentially prevailed on the only claim that they made. Thus, Plaintiffs achieved their entire purpose for suing the Dixon Springs Defendants. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Farrar v. Hobby*, 506 U.S. 103, 111-112 (1992).

**B.     The Number Of Hours Billed In This Case Was Reasonable, And Should Be Approved Based Upon *Hensley* Factors**

As outlined above, the litigation in this case has been intensive and hard-fought, involving more than a dozen depositions, multiple waves of written discovery, and numerous contested motions determined by this Court as well as Judge Reagan. Discovery in this matter required far more time than many cases of this type because of the difficulty in identifying, contacting, and preparing witnesses throughout the state. Likewise, trial preparation was complete since this case was on the verge of trial at the time of settlement.

Under lodestar principles, the amount of the attorney fee award is calculated by multiplying reasonable hours times hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The lodestar is presumptively an appropriate measure of the fee award. *Blum v. Stenson*, 465 U.S. 886, 897 (1984). As the Supreme Court has stated, this "strong presumption that the lodestar figure … represents a reasonable fee is wholly consistent with the rationale behind [§ 1988]." *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989). However, the loadstar may be adjusted either up or down based upon a variety of factors such as:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9)

the experience, reputation, and ability of the attorneys; (10) the 'undesirability of
the case; (11) the nature and length of the professional relationship with the client;
(12) awards in similar cases.

*Hensley*, 461 U.S. at 430.

In total Ed Fox & Associates seeks compensation for 564 hours billed over a nearly five-year history of the case, including time spent on post-trial matters and the fee petition[3], for a lodestar of $272,287.50. The hours billed are documented in Plaintiff's counsel's time sheets updated through today's date, attached hereto as Group Exhibits A, B, and C, and summarized in the following chart.

| Lawyer | Hours | Rate | Total |
| --- | --- | --- | --- |
| **Ed Fox** | **268.75** | **$ 500.00** | **$ 134,375.00** |
| **Gil Sapir** | **252** | **$ 500.00** | **$ 126,250.00** |
| **Jonathon Wassell** | **46.65** | **$ 250.00** | **$ 11,662.50** |
| **TOTAL** | | | **$ 272,287.50** |

Plaintiff's attorneys' fees are reasonable and justified based upon the success that Plaintiff achieved. This court should award Plaintiff's counsel their lodestar for the reasons discussed below.

       1.       **The Amount Involved and Results Obtained**

The most significant *Hensley* factor to be considered by the Court is the degree of Plaintiff's success in relation to his claims. *Farrar*, 506 U.S. at 114; *Telepro, Inc. v. Renello*, 1994 WL 380607 (N.D. Ill. July 18, 1994) ("The degree of Plaintiff's success in relation to his

---

[3] "Ample case law supports the proposition that when a prevailing party is forced to litigate to obtain a fee award, a component of that award may include a reasonable fee for the time expended in preparing and litigating the fee petition." *Trs. of the Chicago Plastering Inst. Pension Trust v. Cork Plastering, Inc.,* 2008 WL 728897, at *6 (N.D. Ill. Mar. 18, 2008).

claims is the most critical factor in determining the amount of attorney's fees awarded."). The statement in this case is notable from a public policy standpoint in that Plaintiffs' victory should contribute to the deterrence of future civil rights violations against Dixon Spring inmates similar to the Plaintiffs. For example, Dixon Springs use of spoiled food, unheated sleeping areas, and inhumane bathroom conditions will likely not continue as the Defendants now know that they could subject themselves to another lawsuit. Further, as noted above, the payouts to the Plaintiffs and class members were well within the range, and likely within the higher part of that range for such cases. As a result of this Plaintiff's attorneys' fees should be awarded to the maximum agreed upon amount. The Plaintiffs received that for which they sued.

     **2.** **Plaintiff's Billable Hours Are Reasonable In Light Of the Fact That Defendant Did Not Offer Any Money to Settle This Case Until Trial Preparation Had Been Done**

In determining an appropriate fee award, courts also consider whether the party claiming attorney's fees rejected substantial settlement offers. *Moriarty v. Svec*, 233 F.3d 955, 967 (7th Cir. 2000). As noted, the Defendant did not offer any money to settle this case until near the end of the case, and after trial preparation was well under way. If Defendant had sooner made a reasonable offer to Plaintiff, then Plaintiff would have engaged in settlement discussions and could have potentially resolved the case short of the extensive trial preparation that was done. Because of the Defendants' failure to sooner offer any amount to resolve this case, Plaintiff had to incur much time and fees in order to bring this case to the eve of trial.

The types of things that were done to prepare for trail were very time consuming and include: making and opposing numerous motions *in limine;* preparing a pretrial order, including jury instructions and *voire dire*; preparing witnesses for trial; reviewing more than a thousand pages of documents to prepare for trial; preparing and reviewing trial briefs; and actually making

witness lists with the approximate time estimates to testify at trial. As a result of this and all that was done on this case, Plaintiffs' fees were reasonable and necessary.

C.     **Plaintiff's Counsel's Hourly Rates Are Reasonable And Should Be Approved**

The purpose and intent of § 1988 is to attract talented lawyers to civil rights cases. By promising to award the prevailing hourly rates, lawyers who could otherwise command high billing rates in commercial pursuits are encouraged to represent clients such as Plaintiff. *See Casey v. City of Cabool*, *Mo*. 12 F.3d 799, 805 (8th Cir. 1993) (citing S. Rep. No. 1011, 94th Cong., 2d Sess. 5 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5913) ("It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases ….")).

Courts often determine the market hourly rate in fee petitions by looking at "the rate charged by lawyers in the community of reasonably comparable skill, experience, and reputation." *Muzikowski v. Paramont Pictures Corp.,* 477 F.3d 899, 909 (7th Cir. 2007). In doing this courts examine the affidavits of the attorneys involved as well as third party affidavits "from other attorneys disclosing their rates for similar cases or through rates courts have awarded in other fee petitions." *Id.* However, out of town lawyer rates are also appropriate when it is difficult to find local lawyers to do a case, or when special expertise is needed or other special factors exist. *E.g., Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768–69 (7th Cir. 1982) (There, the court accepted out of town lawyer rates: "The [District] court did not indicate skepticism over the need for out of town counsel. In fact, the court recognized that Congress intended to encourage plaintiffs to employ counsel capable of putting forth a rigorous prosecution to meet the rigorous defense which defendants would most likely assert.") Once a fee applicant presents sufficient evidence to establish the reasonableness of the rates sought, the burden shifts to the

11

other side to present evidence to justify the award of a lower rate. *Gautreaux v. Chi. Housing Authority,* 491 F.3d 649, 559–60 (7th Cir. 2007).

### 1. Prevailing Market Rates

*O'Sullivan v. City of Chicago,* 484 F.Supp.2d 829, 839 (N.D. Ill. 2007) is one instructive case for the purposes of determining the market rates of attorneys in civil rights cases. The plaintiffs in *O'Sullivan* were police officers who brought a Title VII and retaliation case against the City of Chicago based upon actions of the Chicago Police Department. The case went to trial in April 2006. A federal jury awarded each of the plaintiffs in *O'Sullivan* compensatory damages ($250,000, $50,000 and $25,000) on their retaliation claims. *O'Sullivan*, 484 F.Supp.2d at 832. In *O'Sullivan*, the City of Chicago *agreed* to an hourly rate of $450.00 for attorney Elizabeth Hubbard. *Id.*, at 837-838. From doing online research, Ms. Hubbard appears to be a respected attorney performing employment and domestic relations work since 1974. The City of Chicago also agreed to an hourly rate for attorney Elisabeth Shoenberger (now, Elisabeth Efird) of $335.00. *O'Sullivan*, 484 F.Supp.2d at 834. Online research shows Ms. Efird to have been an attorney since 1997 or about 9 years at the time of the trial. *Id.* Seven years have passed since the City agreed to these hourly rates for Hubbard and Efird.

In consumer law cases, several courts have reviewed fee awards approved for the Chicago law firm of Edelman, Combs, Latturner & Goodwin ("Edelman Combs"). Edelman Combs has a long-established practice in the consumer law field, which is federal statutory work similar to Section 1983 cases, in that both are civil rights cases with fee shifting provisions. Some examples of awards to the Edelman Combs firm are as follows: In 2009, in the case of *In re Trans Union Corp. Privacy Litig.,* No. 00 C 4729, 2009 WL 4799954, at *20 (N.D.Ill. Dec. 9, 2009), Judge Robert Gettleman approved a $550 rate for attorney Daniel Edelman ("Edelman").

That same year, in *Jones v. Ameriquest Mortg. Co.,* No. 05 C 432, 2009 WL 631617, at *4 (N.D.Ill. Mar. 10, 2009), Judge David Coar approved rates of $465 per hour for partners James Latturner ("Latturner"), Catherine Combs ("Combs"), and Tara Goodwin ("Goodwin"), and a rate of $250 per hour for an associate who was six or seven years out of law school during the relevant period. In 2008, Judge Sam Der–Yeghiayan approved rates of $450 per hour for partners at the Edelman firm and $210 per hour for the same associate. *See Hamm v. Ameriquest Mortg. Co.,* 549 F.Supp.2d 1018, 1022 (N.D.Ill. 2008). Lastly, in 2012, Judge Blanche Manning approved rates of $400 per hour for work done in 2011 by attorneys Edelman, Combs, and Latturner in *Jablonski v. Riverwalk Holdings, Ltd.,* No. 11 C 840, 2012 WL 3043687, at *1 (N.D. Ill. July 12, 2012). Edelman, Combs and Latturner had at that time, respectively, thirty-six, thirty-six, and fifty years of practice experience. *Id.*

The case of *Gibson v. City of Chicago,* 873 F.Supp.2d 975, 984-985 (N.D. Ill. 2012), is also a useful guide for attorney's fees in the civil rights context. *Gibson* was a case against the City of Chicago for violations of Section 1983, rather than Title VII. *Gibson,* 873 F. Supp at 981. However, the firm that represented the Plaintiff in *Gibson,* Jackowiak Law Offices, is a civil rights firm comparable to Ed Fox & Associates. In *Gibson*, there was a Plaintiff's verdict and a petition for attorney fees. *Id*. On July 6, 2012, Judge Castillo awarded Lawrence Jackowiak an hourly rate of $395. *Id*. at 983-984. Online research shows that Mr. Jackowiak handles Section 1983 cases and has been in practice since 1996, or about 16 years at the time of the opinion. This is twelve years less than the time that Mr. Fox had practiced law. The Court also ordered $395 per hour for Torreya Hamilton, a civil rights lawyer who has also been in practice since 1995. *Gibson,* 873 F.Supp.2d at 985. Notably the City *agreed* to fees of $275 for

13

Adele Nicholas who online research shows has been in practice since 2008 or 4 years at the time of the opinion. *Id*.; Again, the City agreed to this rate two years before trial in this matter.

In support of the prevailing market rates in and after 2014 for attorneys comparable to Plaintiff's counsel, Plaintiff has attached the affidavits of Paul Strauss, Adele Nicholas, and Julie Herrera. Exhibits D, E, and F respectively. As demonstrated through his affidavit, Mr. Strauss has performed employment litigation work since 1981 and bills at a rate of $550.00 per hour. Ms. Nicholas and Ms. Herrera have been working in the area of civil rights for much less time than the same amount as Mr. Fox or Mr. Sapir, and their billing rates are $300.00 per hour and $350.00 per hour respectively. As noted in his declaration, attached hereto, Mr. Fox always bills hourly clients at $400-$500 depending on the matter and has been awarded in the last 2 years rates of $510 and $490 per hour.

    **2.**    **The Laffey Matrix**

In addition to the prevailing market, the United States Attorney's Office for the District of Columbia has created the Laffey Matrix to provide an official guideline for "reasonable" rates in fee-shifting cases. *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 347 n.3 (6th Cir. 2000) (describing Laffey Matrix as "an official statement of market-supported reasonable attorney fee rates"); Ex. I. "The matrix is intended to be used in cases in which a 'fee-shifting' statute permits the prevailing party to recover 'reasonable' attorney's fees." *See* Laffey Matrix Explanatory Note, Ex. I. Rates in the Laffey Matrix have been approved repeatedly by Courts of Appeals. *Id.* The 2014 Laffey Matrix provides the following rate guidelines:

| Experience | Hourly Rate |
| --- | --- |
| 20+ years | 510 |
| 11-19 years | 450 |
| 8-10 years | 360 |
| 4-7 years | 295 |
| 1-3 years | 250 |

| | |
|---|---|
| Paralegal/Law Clerk | 145 |

*See id.*

Use of the Laffey Matrix to set "reasonable" rates has been approved, either expressly or implicitly, on numerous occasions. *See Arch v. Glendale Nissan*, 2005 WL 1421140, at *1 (N.D. Ill. June 7, 2005); *Berg v. Culhane*, 2011 WL 589631, at *3 (N.D. Ill. Feb. 10, 2011); *Hadnott v. City of Chicago*, 2010 WL 1499473, at *6 (N.D. Ill. Apr. 12, 2010); *Catalan v. RBC Mortgage Co.*, 2009 WL 2986122, at *6 (N.D. Ill. Sept. 16, 2009); *Decker v. Transworld Sys., Inc.*, 2009 WL 2916819, at *5 (N.D. Ill. Sept. 1, 2009); *Robinson v. City of Harvey*, 2008 WL 4534158, at *7 (N.D. Ill. Oct. 7, 2008); *Lopez v. City of Chicago*, 2007 WL 4162805, at *8 (N.D. Ill. Nov. 20, 2007).

Courts outside of Washington D.C. typically adjust the Laffey Matrix for a "locality pay differential." *See Schultz v. City of Burbank,* 2007 WL 1099479, *2 (N.D. Ill. Apr. 10, 2007) (M.J. Soat Brown) (adding 4% to the Laffey Matrix). The locality pay differential for Chicago in 2014 is 25.10% versus 24.22% for the D.C. area, meriting a .88% increase over the Laffey figures. *See Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 650 (N.D. Ill. Dec. 15, 2011) ("another decision in the district suggested that the high cost of living in Chicago necessitates an upward adjustment to the Matrix").

The Laffey Matrix as adjusted for the locality differential would dictate the following rates: $514.49/hour for Ed Fox (who is seeking $500/hour), $514.49/hour for Gil Sapir (who is seeking $500/hour), $250/hour for Jon Wassall (for whom that amount is being sought), and $146.28/hour for Ed Fox & Associates' law clerks (for which the hours have *not* been submitted, as the request herein is already well above that agreed upon in the settlement of a maximum of

$117,000.00) Plaintiffs' counsels' proposed rates are thus directly in line with, or slightly below, the Laffey Matrix presumptions and should thus be approved as reasonable.

    **3.    Given Their Qualifications and Accomplishments in this case, Plaintiff's Counsel Should Be Awarded Their Requested Rates**

As with the number of hours billed, Plaintiff's counsel's hourly rates are set forth on the documents attached hereto as Exhibit G. Plaintiff discusses the justification for these rates below.

    **a.    Ed Fox**

Over the nearly five years plus of this litigation, Ed Fox served initially in a supervisory capacity, providing needed consistency and advice about strategic decisions. Mr. Fox billed efficiently during that time as can be seen by the number of hours billed before January, 2015 (when Jon Wassell left the firm). Mr. Fox's initial time concentrated on strategizing class certification issues. Ed Fox seeks $500/hour, which is less than the $514.49/hour adjusted Laffey Matrix rate and the private sector ranges of $550 awarded to attorney Daniel Edelman in 2009 and Mr. Strauss's billing rate of $550 discussed above in the case law and affidavits. The $500/hour rate sought by Mr. Fox is appropriate.

Mr. Fox has been in practice roughly 30 years. Mr. Fox has been always substantially involved in civil rights litigation in both California and Illinois and has tried more than 60 civil rights cases to a jury (and numerous more bench trials). In connection with airport strip searches and race discrimination issues Mr. Fox has testified before the United States Congress House Ways and Means Committee on racial profiling regarding a proposed class action case which ultimately involved 90 African-American women returning to O'Hare airport from international travel. In 2009, Mr. Fox won an Award for Excellence in Pro Bono and Public Interest Service. As set forth more fully in his declaration, attached hereto as Exhibit G, Mr. Fox has enjoyed success in a wide

range cases, and has been the owner of his law firm since 1998 (with 5 attorneys presently) in which civil rights issues have played the largest role. *See* Ex. G.

Mr. Fox has had numerous successful Appellate and District Court opinions in both the Seventh and Ninth Circuits. He has helped shaped the law in connection with cavity searches at O'Hare airport, the ability to conduct random drug searches in the workplace in California, and evidentiary issues in connection with prior arrests in excessive force/false arrest cases. *See, e.g., Overby v. Chevron* 884 F.2d 470 (9th Cir. 1988); *Anderson v. Cornejo,* 355 F.3d 1021 (7th Cir. 2004); and *Barber v. City of Chicago, et al.,* 725 F.3d 702 (7th Cir. 2013). Mr. Fox has presented at Seminars on Civil Rights issues, the most recent being in 2013 for the Lorimar company on section 1983 issues. Just last year Mr. Fox was lead counsel on a high profile police brutality wrongful death case that was on video tape, shown nation-wide and resulted in a record settlement for an in-custody death. That case included Monell claims that are not unlike class claims as they also involve policy and practice. This case resulted in meetings with the Mayor of Chicago and changes to the way the police department handles cases with the mentally ill. *Estate of Phillip Coleman v. City of Chicago, et al.,* case number 12 cv 10061.

With respect to billing rates, Judge Grady of the Northern District of Illinois awarded Mr. Fox $510.00 per hour in a wage and hour case titled *Bocik, et al., v. Matthews Drywall and Decorating Inc.,* Case No. 13-cv-7011. Ex. G. In 2011, Mr. Fox resolved attorney's fees in two Section 1983 civil rights cases (*Jones v. Clark, et al.* 07-cv-461 and *Hale v. City of Chicago, et al.,* 09-cv-4918) after obtaining a verdict for his client. In both cases, one of which was against the City of Chicago, the Defendants agreed to pay Mr. Fox $465.00 per hour. *Id*. In 2014, Judge Wood agreed to an hourly rate of $490 in a police/discrimination case. This Court should award Mr. Fox the rate of $500 per hour.

17

### b. Gil Sapir

Mr. Sapir is also a long-time attorney with class action experience, much civil rights experience, and significant criminal law experience. When he came into the case, his primary role was to connect with the numerous witnesses that were being discovered, meeting with them, preparing for their depositions and attending their depositions. Mr. Sapir traveled throughout the state to do this work. He also did substantial work in making numerous FOIA requests, following up on them and ultimately receiving many documents that were useful in the case. Mr. Sapir served as the liaison with the witnesses and helped with all aspects of trial preparation. Along with Mr. Fox, Mr. Sapir performed a substantial amount of work to prepare for and attend the settlement conference. Mr. Sapir has previously worked with Mr. Fox on the class action prisoner's rights case of *Murdock v. Roger E. Walker, et al.* 08 C 1142.

For his work in this case, Mr. Sapir is also seeking $500/hour, for reasons similar to that of Mr. Fox. See Ex. G and attachments.

### c. **Jonathon Wassell**

Mr. Wassell was a newer attorney when he began this case, having graduated from the University of Illinois law school in 2012. Mr. Wassell primarily focused on civil rights cases while employed with Ed Fox & Associates. His requested rate of $250 per hour is what this firm billed for work he did for paying clients.

### E. Plaintiff's Expenses And Costs Are Reasonable And Should Be Approved

In its effort to prevail for Plaintiff, Ed Fox & Associates spent $6,002.88 in expenses and costs recoverable under Section 1988 and/or Section 1920. *See* Ex. H, Bill of Costs. <u>Heiar v. Crawford County,</u> 746 F.2d 1190, 1203 (7th Cir. 1984) (holding that a reasonable attorney's fee also includes "expenses that are distinct from … statutory costs or the costs of the lawyer's time

18

reflected in his hourly billing rates," and includes such things as postage, long-distance calls, travel, and computerized legal research); *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 38 F.3d 1429, 1440 (7th Cir. 1994).

Accordingly, Plaintiff should be awarded his total amount of fees and expenses totaling $6,002.88 for the reasons stated in his bill of costs as well as based upon Plaintiff's right to be awarded expenses as a prevailing party.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court grant his Petition for Fees and Bill of Costs. The total lodestar amount of fees plus costs equals $278,239.38. Because of the terms of the settlement agreement and the maximum award agreed to, Plaintiffs respectfully request that this Court award $117,000 in attorneys' fees and costs.

Respectfully Submitted,

s/ Edward M. Fox  
Edward M. Fox

ED FOX & ASSOCIATES, LTD.  
300 West Adams, Suite 330  
Chicago, Illinois 60606  
 (312) 345-8877

# IN THE UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL WILLIAMS, <br> BRIAN THOMAS, <br> SEDRICK PHILLIPS, <br> MIKAL DAVIS, et al. <br><br> Plaintiffs, <br><br> v. <br><br> SALVADOR GODINEZ, et al. <br><br> Defendants. | Case No. 12 cv 808 <br><br> JUDGE REAGAN <br><br> MAGISTRATE WILLIAMS |

## NOTICE OF FILING

To: All Counsel of Record

PLEASE TAKE NOTICE that on February 16, 2017, the undersigned filed with the Clerk of this Court, **PLAINTIFFS' PETITION FOR ATTORNEYS' FEES AND COSTS**, service of which is being made upon you.

s/Edward M. Fox<br>
Edward M. Fox<br>
ED FOX & ASSOCIATES<br>
300 West Adams, Suite 330<br>
Chicago, IL 60606<br>
(312) 345-8877

## PROOF OF SERVICE

I, Edward M. Fox, an attorney, under penalty of perjury, and state that on February 16, 2017, service is being made in accordance with the General Order on Electronic Case Filing section XI.

s/Edward M. Fox<br>
Edward M. Fox