# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL WILLIAMS, <br> BRIAN THOMAS, <br> SEDRICK PHILLIPS, <br> MIKAL DAVIS, et al. <br><br> Plaintiffs, <br><br> v. <br><br> SALVADOR GODINEZ, et al. <br><br> Defendants. | Case No. 12 cv 808 <br><br> Magistrate Judge Stephen Williams |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

NOW COMES the Plaintiffs, by and through their attorneys, ED FOX & ASSOCIATES, LTD., and in support of their Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement, state as follows:

**I.    INTRODUCTION**

The Settlement now before the Court seeks to resolve a conditions of confinement claim against Defendants under 42 U.S.C. § 1983. The settlement was reached after an adversarial motion practice, formal and informal discovery, a settlement conference with the court, and numerous rounds of arm's length negotiations. If approved, the settlement will provide a reasonable award to Plaintiffs and the Settlement Class of $37,050, and attorneys' fees and costs to be determined by this Court. The relief obtained under the Settlement is on par with and, in some cases, greater than that secured in other conditions of confinement cases that have been

approved by Courts in Illinois. In the end, the Settlement represents fair recovery for the Class, and under the law is deserving of this Court's final approval.

The best way to assess the strength of the Settlement is by looking at the reaction of the Settlement Class to it. That reaction has been overwhelmingly positive. Out of 481 potential class members, 87 signed claim forms were received and there were no opt-outs, objections, or notices of intent to appear. See *Winston v. Spearbroeck*, 1996 WL 476692 at *2-3 (no opposition strongly favors approval of settlement).

## II. BACKGROUND

As noted, this motion comes here pursuant to a settlement. In the settlement agreement, the parties agreed that the Plaintiffs would submit an attorneys' fee petition and that Plaintiffs' counsel would need to justify their fees in the petition. Under the agreement, the amount of fees and expenses awarded cannot exceed $117,000.00. This amount was arrived at based upon negotiations. Prior to settlement, Plaintiffs' settlement demand letter to Defendants included attorneys' fees of roughly $155,400, plus approximately $7,000 in costs. The case settled at a compromise rate to accomplish the settlement. As a result, Plaintiffs' counsel agreed to limit their request for fees to $117,000.00.

Further, in connection with the settlement itself, Plaintiffs' original demand for each of the four Plaintiffs was $6,500.00; this was raised to $13,500 in a more recent settlement letter, in large part due to the additional work and development of the case. Each of the Plaintiffs ultimately received $6,000 each. In the context of class action conditions of confinement cases, this sum is at the higher end of the range typically agreed upon.

2

## A. STATMENT OF FACTS

On May 25, 2012, four Plaintiffs filed their complaint against various officials who were charged with running, working at, and/or supervising employees at the Dixon Springs Boot Camp. Plaintiffs alleged a conditions of confinement claim, primarily focusing on the issues of cold, bad food, and bathroom conditions under section 1983. Plaintiffs also made class wide allegations claiming that the conditions applied to all inmates incarcerated at Dixon Springs in that all inmates were subjected to the same allegedly unconstitutional conditions of confinement.

Among other things, the Plaintiffs alleged that Plaintiffs were forced to eat spoiled meat and dairy products and that there were bugs in Plaintiffs' food. They also alleged that the heat was almost never on in the dorms and that class members were not given coats, hats, or gloves despite very cold temperatures, and that they were forced to sleep at night in underwear and with just one thin blanket which was inadequate. In connection with bathroom conditions, Plaintiffs alleged that were are an unreasonably low number of toilets for the number of inmates and that each inmate was allotted a maximum of two minutes or less to use the toilet.

The Court granted Plaintiffs' motion for class certification on March 31, 2014.

In the 6 months leading to trial, the Defendants conducted extensive discovery, propounding interrogatories on Plaintiffs' damages and doing depositions of 9 class witnesses who were all former inmates at Dixon Springs. Extension preparation was done in connection with the depositions. At the depositions, Plaintiffs developed evidence through testimony and expanded on the allegations contained in the complaint. In connection with issues of the cold, the witnesses and plaintiffs have uniformly testified that the dorms were so cold that the guards would only be stationed in there when accompanied by a space heater and heavy coats, while the inmates were in their underwear and t-shirts. The witnesses and Plaintiffs commonly indicated

that one could see his breath when inside a dorm. For bedding, the inmates were allowed one thin well-used blanket and could not request more than that. The Plaintiffs and witnesses were expected to testify that the blankets had holes in them and were often ripped. The problems with the cold and inadequate bedding became exacerbated because the roof in the dorms leaked water.

Cold weather also impacted inmates outside. Exercise usually had to be outside, particularly because the gym was used as a dorm. The inmates exercised in the rain, cold, snow and slush. They were inadequately dressed for that. In this regard, some inmates, *at most,* were outside with thin sweat suits, and because inmates were ordered outside for exercise with little notice, they often did not have the time to retrieve even their sweat suits because if they were late to make it outside (which often happened because of the procedures) they were severely punished. As a result, inmates were often outside in the cold exercising for lengthy periods of time with just t-shirts. Many of them testified that they never had gloves on despite the fact that they were ordered to be prone on the ground in the rain/cold/snow doing such things as pushups, among other exercises, in which they had to lay on the ground. The shoes that the inmates wore were old, many had holes in them, did not fit right, and would leak cold water or snow into the shoes. As a consequence, many of the inmates developed foot problems while at Dixon.

Regarding the food issues the Plaintiffs and their witnesses all gave consistent valuable testimony. All of the inmates and the Plaintiffs would testify to food that was spoiled, expired by date, and/or was bug infested. Some of the Plaintiffs and witnesses were in a particularly good position to be aware of the food issues because they worked in the kitchen. It was more common than not for the milk that was being used to have an expired date on it. The food would sometimes be over-seasoned to attempt to hide the rancid smell of it. The bread often

was moldy. The crackers were usually bug invested. The inmates were commonly told to just pick the bugs out of the food.

Inmates had to eat all the food that was on their tray –whether it was spoiled, moldy, rancid or seasoned such that it was too hot to eat. Inmates would sometimes try and hide moldy or spoiled food to avoid eating it. When caught doing this they would be punished abusively.

Similarly, the testimony and evidence that was developed regarding bathroom issues was also invaluable. The bathroom procedures were inhumane. There were an inadequate number of bathroom stalls and urinals. Compounding this problem, frequently, one or more of the bathroom stalls and/or urinals were not working. This is amply documented in the work order notes. Probably because of the need to have a large number of inmates needing to use a small number of toilets (in addition to simply being malicious), inmates would be allowed very limited time on the toilet. There are varying accounts of this and it would depend on which guard was in charge at the time, but uniformly, the time permitted on the toilet has been reported to be anywhere from 10 seconds to two minutes. If an inmate was not finished he or she was required to get up anyway and this would frequently result in feces falling to the floor, on to the base of the toilet or other places it should not be in. Cleanup of this would not be permitted until sometime after the entire group was done using the bathroom. As a result, bathroom use was often a dirty, unhealthy, and just gross endeavor.

Defendants dispute plaintiffs' allegations and claim that no Eighth Amendment violation exists. They also have argued to the Court, and would present a motion seeking to decertify the class, because (i) no common questions existed, and (ii) individual issues predominated relating to each of the allegations underlying plaintiffs' Eighth Amendment claims. Defendants' position

5

creates risks to recovery for class members that demonstrate the adequacy of the settlement, as discussed below.

### B. SETTLEMENT

The parties tried to settle this case over a lengthy period of time. The Defendants did not make any offer over a lengthy period of time. The parties began to discuss the possibility of settlement in or around December, 2014. This initial discussion went on until the end of June, 2015, but no offer was made. During this time, the Defendants were given leave to do damages discovery. In October, 2015, Plaintiffs were given leave to supplement their Rule 26(a) disclosures with additional witnesses. This was done and Defendants were then given leave to take depositions of the additional persons that were named as witnesses. The depositions of these witnesses were completed during the first half of 2016. Beginning around June, 2016, the parties began trial preparations. Both parties did briefing on motions *in limine* and oppositions, as well as the pretrial order and trial briefs. In August, the Defendants suggested that settlement negotiations might be helpful and a settlement conference was scheduled. The parties were ordered to do written settlement demands. This was continued but it began to appear that settlement might occur. After additional negotiation the case finally settled and this was reported to the court on September 22, 2016.

### III. THE TERMS OF THE SETTLEMENT

### A. CLASS DEFINITION

All individuals who were incarcerated as inmates at the Dixon Springs Impact Incarcerations Program between November 1, 2011 and March 1, 2012.

### B. NOTICE

Notice was by direct mail. The individuals were identified by the Illinois Department of Corrections as being members of the settlement class. IDOC provided a mailing address for 466 members. For the 15 persons for whom there was no address a skip trace was done, and in a few cases, Plaintiffs' attorneys provided information.

### C. CLASS MEMBER PAYMENTS

The Defendants will pay $125.00 to each member of the settlement class. The settlement class representatives will each be paid an incentive award of $6,000.00.

### D. ATTORNEYS' FEES

Subject to approval by the Court, Plaintiffs' attorneys are seeking attorneys' fees plus costs of $117,000.00.

### E. DISMISSAL OF ACTION

Subject to approval of this Motion, each Class Member shall be deemed to have released, discharged, and waive all claims against the Defendants.

## IV. THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS

"To safeguard the rights of class members and allow consideration of the broader implications of a class action settlement, Rule 23(e) of the Federal Rules of Civil Procedure requires that notice of a proposed settlement be sent to all class members." *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980) *overruled by Felzen v. Andreas*, on other grounds, 134 F.3d 873 (7th Cir. 1998). The best notice practical must be provided to all class members. *Phillips v. Petrolueum co. v. Shutts,* 472 U.S. 797, 811-812

(1985). This does not require actual notice to all class members in order to comport with Rule 23. *Burns v. Elrod,* 757 F.2d 151, 154 (7th Cir. 1985).

IDOC provided the mailing address for 97% of the class members. For the other 3%, a skip-trace was done and/or addresses were provided by Plaintiffs' counsel. This easily satisfies Rule 23's notice requirements and due process. *See e.g., Bickel v. Sheriff of Whitley Cnty.,* 2015 WL 1402018, at *3 (N.D. Ind)(finding sufficient notice where a professional settlement administrator provided direct notice to 89.7% of the class). Bickel also noted that "the Federal Judicial Center's checklist on class notice instructs that class notice should strive to reach between 70% and 95% of the class. *See* Federal Judicial Center, *Judges Class Action Notice and Claims Process Checklist & Plain Language Guide* 3 (2010) ("It is reasonable to reach between 70–95%. A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%." *Id.,*

## V. THE SETTLEMENT IS DESERVING OF FINAL APPROVAL

The Seventh Circuit has identified 5 factors that should be tested to determine final approval. The five factors are: (1) the strength of plaintiffs' case compared to the defendants' offered settlement amount; (2) the likely complexity, length, and expense of the litigation; (3) the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *Bickel supra,* at *3 (citing, *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir.2006)).

As shown below, these factors overwhelmingly favor approval here.

## A. THE VALUE OF THE SETTLEMENT IN LIGHT OF THE RISKS OF CONTINUING THE LITIGATION FAVORS FINAL APPROVAL

This factor is considered the most important. *E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir.1985). This factor is tested by balancing the strength of the Plaintiffs' case against the amounts offered in settlement. *Synfuel Techs., supra,* at 653.

Here, Plaintiffs are former inmates having been accused of felony crimes. They were in a boot camp, where conditions are expected to be harsh. The Defendants are officials whose credibility is often seen more highly than that of one with a felony record. In fact, a jury instruction tells the jury that they can factor into their credibility assessment the felony records of a witness.

Further, the well-recognized reality is that prisoner cases do not often result in large awards when there is no significant physical damage. This has been officially recognized as noted by one Court:

> The reality is that both the deep-seated societal antipathy towards prisoners as a class as well as the absence of lost wages or future earnings damages ensures that damages in prisoner cases will nearly always be minimal. *See* Roger A. Hanson & Henry W.K. Daley, *Challenging the Conditions of Prison and Jails: A Report on Section 1983 Litigation* 37 (1995) (recognizing that prisoner settlements and verdicts are smaller because wages are nonexistent and a substantial component of compensatory damages is either lost wages or foregone earnings).

*Johnson v. Daley*, 339 F.3d 582, 606 (7th Cir. 2003)

As a result, the amounts received are well within the range, if not better, than what one might expect had this case gone to trial. The Plaintiffs' settled the case on the one count that was proceeding, and the task of demonstrating some likelihood of success on the merits based upon an Eighth Amendment or Fourteenth Amendment claim for jail [conditions of confinement] would thus be formidable." *Winston v. Spearbroeck,* 1996 WL 476692, at *2–3 (N.D. Ind. Aug.

14, 1996). As a result, Plaintiffs' submit that the settlement should be approved, as the risks are great and the likelihood of a greater recovery at trial is small.

### B. THE LIKELY LENGTH, COMPLEXITY AND EXPENSE OF FURTHER LITIGATION ALSO SUPPORTS APPROVAL

Although discovery had been completed and the case was on the verge of trial, going to trial was fraught with problems. Plaintiffs' counsel had constant problems maintaining contact with their witnesses and Plaintiffs. More significantly, getting the witnesses to southern Illinois was proving to be a difficult task. None of the Plaintiffs' witnesses lived close to court. They had to plan 2-4 days to be off work and in East St. Louis. Making this happen was to be difficult and expensive. It would be expensive because the witnesses would have to be put up in hotels and fed. Trying the case would also be expensive because Plaintiffs' counsel would be out of their offices for 1-2 weeks. In short, there were substantial logistical problems with having Plaintiffs' witnesses available for trial.

Additionally, the case would not be over after a verdict. Post-trial motions and appeals could be filed. The length of time that this process could take would be extensive. Further, Plaintiffs would fear a JNOV motion should they win since conditions of confinement cases are always subject to extensive grey areas. Plaintiffs' counsel were concerned about these issues and the testimony that would support it. Hence, again, Plaintiffs submit that this factor supports approving the settlement.

### C. THE AMOUNT OF OPPOSITION TO THE SETTLEMENT STRONGLY FAVORS APPROVAL

In short, there has been no opposition to the settlement and thus, this factor favors approval.

## D. THE OPINION OF COMPETENT COUNSEL FAVORS APPROVAL

The next factor to consider is the opinion of counsel. *Synfuel Techs., supra,* at 653. This is especially true where class counsel are qualified, where discovery and settlement negotiation have taken place and where there is no indication of collusion. *Id., see also, Hispanics United v. Vill. of Addison,* 988 F.Supp. 1130, 1150 n. 6 (N.D. Ill. 1997).

Here, as the Court Has already recognized when it granted class certification, counsel is experienced and qualified. Counsel has built their practices on doing civil rights cases, of which, inevitably, some are class actions. Further, there was extensive discovery and settlement negotiation.

Mr. Sapir's most prominent task was to track down witnesses wherever they might be within the state, determine who would be a good witness, and spend considerable time working with them and understanding the conditions and processes at Dixon Springs. This led to depositions which were extraordinarily helpful. This also led to settlement negotiations. Plaintiffs' had always maintained that their named Plaintiffs' cases would be worth, roughly, about $6,000.00. The class members' cases are often within the $100-$150 range. The settlement negotiations only began to become serious when trial was imminent and the parties spent substantial time in hammering out an agreement. Given that the Defendants were intent on making motions to de-certify the class or re-define the class to only the dates that Plaintiffs were present, and that there was a reasonable possibility this good happen, settling the case for the likely class members without prejudicing the rights of those that fall outside the class, along with reasonable sums of money to be paid on the sole claim in the case, is always a good outcome.

### E. THE CONSIDERATION OF THE STAGE OF THE PROCEEDINGS AND DISCOVERY COMPLETED ALSO SUPPORTS APPROVAL

The final consideration, "the stage of the proceedings and the amount of discovery completed at the time of settlement" *Synfuel,* 463 F.3d at 653, is a relevant factor because it determines how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims, and demonstrates that the parties have litigated the case in an adversarial manner. *See Newberg on Class Actions* § 13.50 (5th ed.).

Here, the settlement occurred only after a contested determination of class certification and many motions *in limine*. Plaintiffs' Counsel took depositions of the defendants, did written discovery, followed up with FOIA requests, and conducted an investigation into the Plaintiffs' claims by talking to in excess of 35 witnesses. Counsel also analyzed appropriate materials to determine such things as the functioning or non-functioning of the bathrooms and issues of food spoilage. This is more than what appeared to be done in *Bickel, supra,* at *5 (N.D. Ind. Mar. 26, 2015). Hence, this factor also supports approval.

### VI. ATTORNEYS' FEES AND INCENTIVE AWARDS

#### 1. Attorneys' Fees

The Settlement Agreement provides that Class Counsel shall apply for attorneys' fees and costs as approved by the Court and receive a maximum of $117,000.00. This information was provided to the class members in their notice. A lodestar is a reasonable way to determine attorneys' fees. Although the numbers are different this is a similar structure to *Bickel supra,* at *6 (N.D. Ind. Mar. 26, 2015), which was approved. As noted in Plaintiffs' separate motion for attorneys' fees, using the lodestar method is appropriate in prisoner rights class cases. Subject to the Court's determination of fees, this is a reasonable process here as well and should be approved.

## 2. Incentive Award

"Incentive awards are justified when necessary to induce individuals to become named representatives." Here, the Plaintiffs had to be available over a nearly 5 year period and were frequently contacted and consulted about various issues. They were called upon to have meetings at various times and they were in the process of making themselves available for trial. A $6,000 incentive award is thus reasonable. *See, Bickel, supra* at *7 (In *Bickel,* the Court approved a $10,000 incentive award in a prisoner case.)

## VII. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully submit that the Court should approve settlement in this case as fair and reasonable.


Respectfully Submitted,

                                            s/ Edward M. Fox
                                            Edward M. Fox

ED FOX & ASSOCIATES, LTD.
300 West Adams, Suite 330
Chicago, Illinois 60606
(312) 345-8877

**IN THE UNITED STATE DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL WILLIAMS,<br>BRIAN THOMAS,<br>SEDRICK PHILLIPS,<br>MIKAL DAVIS, et al.<br><br>    Plaintiffs,<br><br>v.<br><br>SALVADOR GODINEZ, et al.<br><br>    Defendants. | Case No. 12 cv 808<br><br>Magistrate Judge Stephen Williams |

## NOTICE OF FILING

To: All Counsel of Record

PLEASE TAKE NOTICE that on February 21, 2017, the undersigned filed with the Clerk of this Court, **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**, service of which is being made upon you.

                                                    s/Edward M. Fox
                                                  Edward M. Fox
                                                  ED FOX & ASSOCIATES
                                                  300 West Adams, Suite 330
                                                  Chicago, IL 60606
                                                  (312) 345-8877

## PROOF OF SERVICE

I, Edward M. Fox, an attorney, under penalty of perjury, and state that on February 21, 2017, service is being made in accordance with the General Order on Electronic Case Filing section XI.

                                                    s/Edward M. Fox
                                                    Edward M. Fox